HESSIAN, Plaintiff in error, vs. THE STATE, Defendant in error.

*May 12—June 18, 1928.*

436

438

*Edward H. Ryan,* attorney, and *S. G. Dunwiddie,* of counsel, both of Janesville, for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General, J. E. Messerschmidt,* assistant attorney general, and *George S. Geffs,* district attorney of Rock county, and oral argument by *Mr. Messerschmidt* and *Mr. Geffs.*

CROWNHART, J. The attorney for defendant made timely objection to the introduction of any evidence secured by the search of defendant's private residence, on the ground that the search warrant was improperly issued. The statement of the chief of police, under oath, upon which the warrant was issued, does not show that the chief of police had any personal knowledge that the defendant possessed any liquor of any kind in his private residence. It does show that he sent one of his police officers with an under-cover man to the residence, and that the chief of police was told by the policeman who accompanied the under-cover man, who went into the home and returned with two bottles of home brew, that the defendant offered to sell him, the under-cover man, alcohol. This story of the under-cover man to the policeman was hearsay testimony, once removed, and was the basis for the search warrant and upon which it was issued.

Under authority of *Glodowski v. State,* decided herewith (*ante,* p. 265, 220 N. W. 227), the search warrant was illegal and the evidence should have been suppressed. The conviction and sentence of the defendant must be reversed under authority of *State v. Jaeger, ante,* p. 99, 219 N. W. 281.

This case well illustrates the wisdom of the decision in *Glodowski v. State, supra.* If the under-cover man whom

the chief of police procured to go into the defendant's private dwelling returned with two bottles of home brew, still there was nothing illegal *per se* about the transaction. The defendant was entitled to have in his possession "home brew." *Endish v. State,* 188 Wis. 259, 205 N. W. 822. He was not entitled to sell the same if it contained more than one half of one per cent. of alcohol, but there was no evidence produced by the chief of police before the magistrate that the home brew did contain any alcohol. The under-cover man was reported to have said that the defendant offered to sell him alcohol. If so, and he was looking for evidence, why didn't he purchase alcohol, which, if suitable for a beverage, would have been proof of an offense? However, he did not purchase alcohol, and he did not testify on the examination or on the trial, and the chief of police refused to disclose his name.

The possession of alcohol in a private residence is not even *prima facie* evidence of unlawful possession. Sec. 165.30, Stats., provides:

"The possession of liquor by any person without a permit, other than in his private dwelling used exclusively as such, shall be *prima facie* evidence of unlawful possession."

One may have alcohol in his private residence lawfully if it is not sold or for sale. Moreover, liquors lawfully acquired for private use and not for sale, kept in the owner's private dwelling, occupied by him as such, may be used by him, his family, and *bona fide* guests in such dwelling. Sec. 165.23, Stats. The purpose of the legislature to fully protect and preserve the privacy of a person's dwelling, as at common law, is thus shown by express language plainly stated.

The search warrant was executed in a manner that showed complete disregard of defendant's right to privacy. Defendant was in his living room, eight and one half by fifteen feet,

which contained, among other things, a table, stove, couch, and chairs. His wife was in the room, with a baby two years old and another child four years old playing on the floor, and his upstairs neighbor was sitting on the couch. The chief of police, with seven other police officers, rushed the place in the nighttime. What took place in that room might well be described as a riot. The defendant testified that the children were crying, the dogs were barking, and the officers were hollering. The testimony is highly contradictory, as it naturally would be under the circumstances.

The statute under which the search was made expressly provided that "no search warrant shall issue to search any private dwelling, occupied as such, unless it is being used for the unlawful manufacture for sale, unlawful sale, or possession for sale, of liquor." Sub. (6), sec. 363.02, Stats. From what happened on the trial it might well be assumed that the warrant was not secured in good faith, but was secured for the purpose of obtaining evidence of possession of liquor—a quite different offense than that for which the warrant might be legally issued, for no evidence was offered in any way that liquor was unlawfully possessed for sale, manufactured for sale, or sold. This was clearly an illegal search.

In the case of *Entick v. Carrington,* 19 How. St. Tr. 1030, decided in England in 1765 by the chief justice of the court of common pleas, afterwards Lord CAMDEN, and which decision comes down to us as part of our common law, the subject of search warrants is ably considered. There a search warrant had been issued to seize papers of the defendant on the charge of libel. The Chief Justice said:

"Before I state the question, it will be necessary to describe the power claimed by this warrant in its full extent.

"If honestly exerted, it is a power to seize that man's papers, who is charged upon oath to be the author or publisher of a seditious libel; if oppressively, it acts against every man, who is so described in the warrant, though he be innocent.

"It is executed against the party, before he is heard or even summoned; and the information, as well as the informers, is unknown. It is executed . . . in the presence or the absence of the party . . . and without a witness to testify what passes at the time of the transaction; so that when the papers are gone, as the only witnesses are the trespassers, the party injured is left without proof.

"If this injury falls upon an innocent person, he is as destitute of remedy as the guilty; and the whole transaction is so guarded against discovery, that if the officer should be disposed to carry off a bank-bill, he may do it with impunity, since there is no man capable of proving either the taker or the thing taken.

"It must not be here forgot, that no subject whatsoever is privileged from this search."

In that case the authority of a "Lord of His Majesty's Privy Council" to issue the writ was denied, notwithstanding the authority had long been exercised without objection before that time. Lord CAMDEN, a contemporary and a friend of William Pitt, took a very active interest in preserving the rights and liberties of the colonies, and it cannot be doubted that in writing the provisions as to searches and seizures into the federal constitution the colonies were greatly influenced by the decision in this case. It was their protection under the common law, and it was their protection under the constitution. The Wisconsin constitution followed the federal constitution on searches and seizures. The forebodings of Chief Justice CAMDEN in the *Entick Case, supra,* were more than realized in the instant case. Also see *Allen v. State,* 183 Wis. 323, 197 N. W. 808.

*By the Court.*—The judgment of the municipal court is reversed, with directions to discharge the defendant.